DAVID McCLURE, as Temporary Receiver of THE LIFE UNION, Respondent, *v.* LOUIS P. LEVY, Appellant.

*Request by both parties for the direction of a verdict — purchaser of promissory notes of a corporation — when in no better position than the payees, its directors — misapplication of the reserve fund of a mutual benefit association.*

When each of the parties to an action, at the close of the trial thereof, requests the court to direct a verdict in his favor, the facts most favorable to the contention of the party in whose favor the judgment is directed must be deemed to have been found.

Where the purchaser of certain corporate promissory notes, drawn to payees who were directors of the corporation, is apprised, by the face of such notes, that they are non-negotiable and payable only out of such portion of the income of the corporation as may be properly applicable thereto, and when he has knowledge of the facts attending the making and delivery thereof, he is in no better position, as against the maker of such notes, than the payees.

The amendment of the by-laws of a mutual benefit association by its directors, so as to permit the use of the reserve fund of the association in such a manner as to deprive the members thereof of the benefit and protection of such fund, is invalid, as the passage of such an amendment is beyond the powers of the directors.

APPEAL by the defendant, Louis P. Levy, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 16th day of May, 1893, upon the verdict of a jury rendered by direction of the court after a trial at the New York Circuit before the court and a jury, and also from an order entered in said clerk's office on the 22d day of May, 1893, denying the defendant's motion for a new trial.

This action was brought against Louis P. Levy, formerly president of The Life Union, a mutual benefit association, of which the plaintiff was appointed temporary receiver, to recover certain money alleged to have been wrongfully withdrawn from the funds of the corporation.

*Charles Strauss*, for the appellant.

*David McClure*, for the respondent.

PARKER, J.:

The contents of the record now before us only the more strongly confirm the view taken by this court on the appeal from the order of arrest granted in this action, that the defendant was chargeable with having wrongfully withdrawn a portion of the funds of The Life Union and converted the same to his own use (68 Hün, 525).

The facts inducing and constituting the alleged conversion are as follows: Early in April, 1891, the directors of The Life Union, for the purpose of extending its business, which was then at a standstill, entered into negotiations with the president of the Flour City Life Association of Rochester, N. Y. The result was in effect an agreement to purchase the Flour City Association for the sum of

$40,000, the major portion of which the directors of The Life Union expected to raise on its notes, to be made in the following form:

" $1,000.                               NEW YORK, *April* 13, 1891.

" On or before twenty-four months after date, The Life Union, of the city of New York, promises to pay to the order of

one thousand dollars, at its office in the city of New York, from such portion of the income of the said The Life Union as may be properly applicable thereto, with interest, value received.

" THE LIFE UNION,

" By J. T. BALDWIN, *President.*

" [SEAL.]                    RALPH MARDEN, *Secretary.*"

Eleven of such notes were made payable to the order of certain of the then directors of The Life Union and delivered to the payees, who cashed them, the money being turned over to Mr. Baldwin, who had previously been authorized by resolution to act as the agent of the corporation in carrying out the contract with the Flour City Association. The money thus advanced by the directors was by Baldwin paid over to Underhill, the president of the Flour City Association.

In pursuance of the plan which the officers of the two corporations had agreed upon, as affording the most feasible method by which The Life Union could absorb the Flour City Association, several of the directors of the latter corporation resigned, and in their places were elected certain of the directors of The Life Union. But there the matter of amalgamation practically terminated, for on the recommendation of the Superintendent of the Insurance Department, the Attorney-General in behalf of the State commenced a suit to dissolve the Flour City Association, and distribute its assets among those entitled thereto, and judgment was thereafter rendered in accordance therewith. The Life Union, therefore, received no benefit whatever from the notes or their proceeds, but that fact did not necessarily relieve it from liability to respond, so far as it might be able to do so, in pursuance of the conditions expressed in the notes, provided its officers were invested with authority to make the agreement and issue the notes.

Our attention has not been called to any decision holding that

corporations, such as were parties to this attempted amalgamation, have the power to bring about an absorption of one corporation by the other. The law does allow one company to reinsure the risks of another, but that was not the purpose of the agreement in question. It contemplated the acquisition of the franchises and assets of the selling company as well as the opportunity to reinsure its risks.

As this question has not been discussed by one of the counsel on this appeal, and there still remains another ground on which we think the affirmance of the judgment may be safely predicated, we shall not attempt to pass upon the question of power.

A little over a year after the date of the notes the defendant was elected a director and president of The Life Union. At the same time there were chosen such other directors as he desired, in order to give him control of the board. What it was that so stimulated his ambition to become the president of the corporation, and have the control of the board of directors, as to induce him to pay something like $12,000 for these notes, we are not informed. Certain it is that he did pay such amount for the notes, and that he could not have secured the presence of his friends in the board of directors and the presidency for himself otherwise. And he purchased these notes with full knowledge of the facts attending their execution and delivery to the several directors of the corporation. In making this assertion we do not lose sight of the fact that the evidence relating to several questions of fact permit contrary inferences, but at the close of the trial the defendant asked for a direction of a verdict in his favor, which was promptly followed by the same request on the part of the plaintiff, resulting in a direction of a verdict by the court that plaintiff have judgment. Both parties having requested the court to direct a verdict, the facts most favorable to the plaintiff's contention must be deemed to have been found. Being apprised by the face of the notes that they were non-negotiable and payable only out of such a portion of the income of The Life Union as might be properly applicable thereto, and having, as we have already observed, knowledge of the facts attending their making and delivery, it follows that defendant was in no better position as against the company than the directors themselves. They would clearly have been liable as wrongdoers had they, through official action, diverted from the reserve fund a sum of money suffi-

cient to pay the notes. That is what the defendant by his own action and that of his chosen directors accomplished.

About six months after he had entered upon the discharge of the duties of his office as president of The Life Union, he took the first step, so far as we are informed by the record, in the direction of securing the payment of the notes.

It is not unlikely that he fully appreciated the impending storm which a few weeks later drove the corporation into a receivership.

November 7, 1892, the by-laws were amended as follows: "The board of directors shall have authority to fix and determine the amount of benefits for which certificates of membership will be issued, rates of assessments, admission fees and annual dues; and to adopt such other rules and regulations as they may deem best for the interest of the association, and shall have the authority to adopt and execute, in addition to the mode in these by-laws provided for, such other or additional plans and systems of participation in benefits of membership, and of the holding, division and legal investment of reserve fund and accumulations in conformity with the laws of the State of New York, and of the use thereof for any lawful purpose deemed to be for the promotion, well-being and interest of the association and for the benefit of members from time to time as the board of directors may deem expedient and for the best interest of the association."

Having thus provided, as the president supposed, a way by which the moneys in the treasurer's hands could be applied in payment of the notes, with some appearance, at least, of regularity, the president, on some day during the following month, called a meeting of the board of directors. During the morning of the day of the meeting, and before the hour fixed for that purpose, the president, evidently with full confidence that his chosen directors would not attempt to thwart his intended raid upon a fund set apart for a particular purpose, directed the treasurer Winans to ascertain the entire amount of the reserve fund then on deposit in the National Park Bank, and to draw a check payable in cash for such amount. It turned out that the amount of the reserve fund was less than the face of the notes, but a check for all there was, amounting to a little over $10,000, was made out by the treasurer and delivered to the president. The president promptly sent the check to the bank for cer-

tification and an hour or so later the directors' meeting was called to order and the following resolution promptly passed :

"*Resolved*, it being apparent from notes presented that Mr. Louis P. Levy has taken up notes to the amount of eleven thousand ($11,000) dollars drawn by the company, we hereby authorize our officers to draw upon our reserve fund to pay such notes, with interest."

The resolution having been safely passed and the certified check for every cent in the reserve fund having come into the president's possession, he on the same day resigned his trust.

The by-law may have been passed to give the appearance of regularity to the action contemplated, or possibly on the assumption that its authorization to use the reserve fund for any lawful purpose deemed to be for the "promotion, well-being and interest of the association and for the benefit of members," would protect the directors in appropriating the funds to any purpose not absolutely disassociated from the affairs of The Life Union.

The by-law does not admit of such a construction, but were it otherwise it would be invalid, because in excess of the power of the directors.

The statute then in force provided for the accumulation and maintenance of a reserve or emergency fund, which "shall be held for the benefit or protection of its members, their legal representatives or beneficiaries" (Chap. 690, Laws 1892, § 205), while the scheme which this by-law is invoked to protect is one to deprive the members of the benefit and protection of the reserve fund.

As the officers and directors of the corporation were without authority to make use of the reserve fund in payment of the notes, and the action taken was not only with the knowledge of, but induced by, the defendant while charged with the duty of protecting and preserving the fund, it follows that judgment was properly rendered against him.

The judgment should be affirmed, with costs.

Follett, J., concurred.

Van Brunt, P. J.:

I concur. Upon the face of the notes it appeared that the moneys used to pay the notes were not properly applicable thereto.

Judgment affirmed, with costs.